UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAFE STEP WALK IN TUB CO.,

                Plaintiff,

   -against-

CKH INDUSTRIES, INC.,

                Defendant.

No. 15 Civ. 7543 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

      Plaintiff Safe Step Walk In Tub Co. ("Safe Step") manufactures walk-in bathtubs and purportedly holds trademarks for the marketing of such tubs. Through a series of agreements executed by the parties, Defendant CKH Industries, Inc. ("CKH"), was able to use those trademarks when marketing, selling, and installing Safe Step's tubs in particular geographic areas. Safe Step initiated this action claiming nonpayment of certain marketing fees by CKH, and CKH counter-claimed—alleging that Safe Step was violating the franchise laws of various states, breaching the agreements between the parties, and engaging in other unfair business practices including fraud. Safe Step now seeks to dismiss CKH's counter-claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the following reasons, the motion to dismiss is GRANTED in part and DENIED in part.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3|16|2017

# BACKGROUND

## I.     Overview

Safe Step initiated this action on September 23, 2015, for non-payment of fees associated with one of the agreements entered into between the parties, which was attached to Safe Step's complaint.  (*See* Compl., Ex. A ("Marketing Addendum"), ECF No. 1.)  The agreement at issue, an addendum related to marketing, purports to modify a pre-existing "Dealership/License Agreement" between the parties, which was not attached to the complaint even though it was referenced therein.  (Compl. ¶¶ 9-10, 12-13.)  Safe Step presents the business relationship between itself and CKH as a licensor-licensee, or supplier-dealer, arrangement: Safe Step granted CKH license to use its trademarks and to deal in its bathtub products.  (*Id.* ¶¶ 5, 7.)

When CKH answered Safe Step's complaint and asserted its own counter-claims, it provided one of the underlying agreements, which CKH alternatively refers to as a Franchise Dealership Agreement.  (*See, e.g.*, Answer ¶ 5 & Ex. A, ECF No. 13.)  CKH filed its amended answer with counter-claims on November 4, 2015, which serves as Defendant's operative counter-complaint, attaching more of the underlying agreements.  (Am. Answer ("AACC"), Exs. 1-5, ECF No. 33.)

## II.    The Agreements[1]

Reviewing the agreements provided by the parties and incorporated into their pleadings, it is evident that Safe Step and CKH entered into base or "regional" agreements, based on sales regions, with addendums specifying components of the business relationship.  For example, the base agreement for the New York and New Jersey area is styled as a "Dealership/License

---

[1]  The Court assumes the truth of the facts alleged in Plaintiff's complaint and Defendant's counter-complaint, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and considers documents which are either incorporated by reference, or integral to the claims asserted, in these complaints.  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Agreement" between Safe Step (as licensor) and CKH (as licensee) and covers specific counties in both states.  (*See* AACC, Ex. 1 ("NY/NJ Agreement") ¶ 26 (defining the "territory" for the agreement).)  It includes a list of "[t]rademarks, [m]arks, [s]logans and [n]ames" that CKH could use within the designated territory.  (NY/NJ Agreement at 13; *id.* ¶ 7.)  CKH was to be the "exclusive Licensee" allowed to market Safe Step's products in the region, and Safe Step was obligated to "[s]end all relevant sales leads in [CKH's] [t]erritory" that it garnered "through customer inquiry, *advertising*, website, trade shows, *or any other type of media lead generation*" to CKH.  (*Id.* ¶¶ 2, 8(b).)  CKH, in turn, was required to achieve either the minimum sales requirements or the advertising budget outlined in one of the agreement's addendums.  (*Id.* ¶ 5.)  The agreement also provided for the contemporaneous payment of a $10,000 "licensing" fee.  (*Id.* at 16.)[2]  The parties expressly agreed, however, that "Licensee [CKH] [was] an independent contractor and [had] not been granted a franchise."  (*Id.* ¶ 14.)  The agreement took effect on May 10, 2009.  (AACC ¶ 86.)

The agreement also specified a number of items relevant to issues in this action, including areas where Safe Step could direct CKH to make changes to its business model (*e.g.*, NY/NJ Agreement ¶ 10), the term of the agreement (*id.* ¶ 2 (five-years subject to renewal terms)), grounds for termination of the agreement and the effect of termination (*id.* ¶ 3), a

---

[2]  The "Granting of Appointment" clause, (*see* NY/NJ Agreement ¶ 1), summarizes the main features of the agreement:

> Licensee will be appointed as the exclusive Licensee to market, sell, install and service only the products . . ., reflected on the attached form.  Licensee shall purchase the Products from the Licensor in accordance with the terms and any conditions of this Agreement. . . . Licensee agrees that it will only market the Product(s) in its area or areas of prime responsibility ('Territory'), . . . from locations approved by Licensor in its discretion not to be unreasonably withheld.  Licensee agrees to use its best efforts to market, sell, promote and install the Products and related services covered by this Agreement.  Licensee shall pay to Licensor a License Fee in the Amount of $10,000.00 commencing upon the execution and delivery of this Agreement by the parties hereto, and no annual Licensee Fee thereafter[.]"

mandatory arbitration clause (*id.* ¶ 18), and a forum selection clause in the event either party sought injunctive relief (*id.* ¶ 24).  Finally, the provisions of the agreement specified that it, along with the attached or referenced schedules, constituted the entire agreement between the parties, that any changes to the agreement had to be made in writing, and that each provision was intended to be severable in case any particular provision or set of provisions were deemed invalid.  (*See id.* ¶ 23.)

The other regional agreements contain the same base terms for different regions, incorporating the same trademarks that CKH could use when selling and marketing Safe Step's tubs in the region, similar minimum sales requirements or advertising contributions to be made by CKH, and the same "license fee" that CKH would pay in order to enter into a given regional agreement.  (*See* AACC, Ex. B ("Mass./NH/VT Agreement"), Ex. C ("Albany Agreement"), Ex. D ("Hartford Agreement"), Ex. E ("Boston Agreement").)  Defendant also alleges the existence of an oral agreement under the same terms covering the counties of Hampshire and Bristol in Massachusetts ("Hampshire/Bristol Agreement").  (AACC ¶ 82.)  The Mass./NH/VT Agreement took effect on June 10, 2009, the Albany and Hartford Agreements on July 15, 2009, and the Boston and Hampshire/Bristol Agreements on February 10, 2010.  (*Id.* ¶ 86.)

The Marketing Addendum, which serves as the basis for Plaintiff's action, ostensibly modified all of the regional agreements to provide a fee schedule for Safe Step's national and regional advertising efforts, and to require CKH to pay Safe Step on a monthly basis "for the unique leads received" as a result of the advertising, but left the remaining terms intact. (Marketing Addendum at 1, 3-4.)  The addendum took effect January 1, 2014.  (*Id.* at 1.)

### III.    Defendant's Allegations

Defendant brings twenty-two counter-claims against Plaintiff for breach of contract,

breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust

enrichment, violations of various state franchise laws, violations of state laws prohibiting unfair

or deceptive business practices, and fraud.  Defendant seeks damages (AACC ¶ 294) and

injunctive relief (*id.* ¶¶ 288-93).

The crux of Defendant's position is that Plaintiff was in fact a franchisor who attempted

to structure the agreements between Safe Step and CKH to avoid federal and state franchise

laws.  (*Id.* ¶¶ 67, 75, 97, 100.)  Defendant alleges that Plaintiff has defaulted under the

agreements by refusing to honor its obligations and by terminating the agreements, or failing to

renew them, despite Defendant's performance of its side of the bargains.  (*Id.* ¶¶ 101-03, 108,

110, 119.)  Defendant contends that these acts violate either state franchise laws or state laws

prohibiting unfair or deceptive business practices, and constitute a fraud perpetrated by Plaintiff

designed to intentionally escalate CKH's costs in order to constructively terminate the alleged

franchises and unlawfully compete directly against CKH.  (*Id.* ¶¶ 114, 116, 118.)

### IV.    Current Posture

Plaintiff's motion to dismiss Defendant's counter-claims was fully submitted as of March

11, 2016.  (ECF No. 49.)

## STANDARD ON A MOTION TO DISMISS

Under Rule 12(b)(6), the inquiry is whether the complaint "contain[s] sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007));

*accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  "While legal conclusions can

provide the framework of a complaint, they must be supported by factual allegations." *Id.*

at 679.  To survive a motion to dismiss, a complaint must supply "factual allegations sufficient

'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,

493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  The Court must take all

material factual allegations as true and draw reasonable inferences in the non-moving party's

favor, but the Court is "'not bound to accept as true a legal conclusion couched as a factual

allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements

of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

In determining whether a complaint states a plausible claim for relief, a district court

must consider the context and "draw on its judicial experience and common sense." *Id*. at 662.

A claim is facially plausible when the factual content pleaded allows a court "to draw a

reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

## DISCUSSION

Defendant's claims arise out of the relationship allegedly formed via the agreements

executed by the parties.  As such, the law to apply when interpreting those agreements is a

threshold issue before turning to the viability of any of Defendant's causes of action.  Although

Plaintiff brought this diversity action[3] in New York and asserts New York law applies,

Defendant argues that Tennessee law governs the contract disputes based on the parties'

agreements.  (*Compare* Pl. Mem. at 9-13, ECF No. 50, *with* Def. Opp'n at 16-20, ECF No. 53.)

---

[3] Defendant's suggestion that the Court also has jurisdiction pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, is misplaced.  *See, e.g.*, 15 U.S.C. § 45(m)(1)(a) (allowing the "Commission" to bring actions in federal court, but not private litigants); *see also G&R Moojestic Treats, Inc. v. Maggiemoo's Int'l, LLC*, No. 03 Civ. 10027 (RWS), 2004 WL 1110423, at *9 (S.D.N.Y. May 19, 2004) ("there is no private right of action to enforce . . . any [] regulation promulgated under the [FTCA]").  The Court is also perplexed as to how 28 U.S.C. § 1345, allowing for federal jurisdiction when the plaintiff is the United States, is applicable here.  (AACC ¶ 64.)

Defendant additionally argues that the law of each state where an alleged tort occurred governs the tort and statutory claims.  (Def. Opp'n at 20-21.)

## I.    Choice of Law

"A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits." *McPhee v. Gen. Elec. Int'l, Inc.*, 736 F. Supp. 2d 676, 679 (S.D.N.Y. 2010), *aff'd*, 426 F. App'x 33 (2d Cir. 2011); *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).[4] "Generally, [New York] courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016) (quoting *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006)).[5] "Where a choice of law clause is not dispositive, '[t]he first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *Fireman's Fund*, 822 F.3d at 641 (quoting *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)).  If a conflict exists, then "the controlling law would be the contract's 'center of gravity,' which typically is the place of contracting or performance." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 188 (2d Cir. 2016) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)).

The regional agreements contain mandatory arbitration clauses that cover "[a]ny controversy, dispute or claim arising out of, in connection with or otherwise relating to any provision of [the] Agreement[s], or to the breach, termination or validity" of the Agreements.

---

[4]  The Court has diversity jurisdiction over the claims at issue as Plaintiff and Defendant are allegedly diverse corporations based in Tennessee and New York, respectively.  (AACC ¶¶ 61-62); 28 U.S.C. § 1332(a).

[5]  Similarly under Tennessee law, "parties ordinarily are free to contract that the law of some jurisdiction other than that of the place of making will govern their relationship.  *Goodwin Bros. Leasing v. H & B Inc.*, 597 S.W.2d 303, 306 (Tenn. 1980).  Such provisions are enforced so long as there is a material connection between the transaction and the law chosen, and the chosen law is not contrary to the public policy of the state whose law would otherwise govern.  *Id.* (the provision should also have been executed in good faith, with the law chosen being reasonable—not a sham or subterfuge).

(*See, e.g.*, NY/NJ Agreement ¶ 18.)  As a preliminary matter, Plaintiff is mistaken that the

arbitration clause was extinguished when the regional agreements purportedly expired.  (*See* Pl.

Reply Mem. at 2, ECF No. 56.)  In New York,

> a broad arbitration clause in an agreement survives and remains
> enforceable for the resolution of disputes arising out of that
> agreement subsequent to the termination thereof and the discharge
> of obligations thereunder, irrespective of whether the termination
> and discharge resulted from the natural expiration of the term of the
> agreement, a unilateral termination under a notice of cancellation
> provision[,] or the breach of the agreement by one of the parties.

*Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 598-99 (1997).  The same is true in

Tennessee.  *Samson. v. Hartsville Hosp., Inc.*, No. 01A01-9609-CH-00430, 1997 WL 107167,

at *3 (Tenn. Ct. App. Mar. 12, 1997).  *See also Huffman v. Hilltop Companies, LLC*, 747 F.3d

391, 398 (6th Cir. 2014) (there is a strong presumption that arbitration clauses survive the

expiration of an agreement); *Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers

Union, AFL-CIO*, 430 U.S. 243, 251 (1977).[6]

Furthermore, the arbitration clauses provide that "[a]ny arbitration held" is to be

"governed by the substantive law of the State of Tennessee."  (*Id.* (the clauses also set venue in

Tennessee).)  When read in conjunction, the provisions mandate arbitration pursuant to

Tennessee law of any claims, contract or tort, related to the regional agreements.  *See McPhee*,

426 F. App'x at 34 (choice-of-law clause will apply to contract and tort claims where "express

language of the provision [is] 'sufficiently broad' as to encompass the entire relationship

between the contracting parties") (citations omitted); *English Mountain Spring Water Co. v.

AIDCO Int'l, Inc.*, No. 07 Civ. 0324 (TWP), 2008 WL 2278627, at *3 (E.D. Tenn. May 30,

---

[6]  Additionally, the agreements at issue contain a broadly-worded survival clause: "Termination pursuant to this [Termination] Section [paragraph 3] *or otherwise* shall not relieve either party of its responsibilities, duties, and obligations contained in this Agreement, which shall continue thereafter . . . ."  (*See, e.g.*, NY/NJ Agreement ¶ 3 (providing for certain irrelevant exceptions as to which provisions "continue") (emphasis added).)

2008) ("Tennessee will apply a choice-of-law provision to the entirety of the dispute between two parties, especially when the clause purports to govern disputes between the parties").[7]

The only exception to mandatory arbitration under the agreements is in instances where a party is seeking injunctive relief.  (*See, e.g.*, NY/NJ Agreement ¶ 24 ("Notwithstanding the provisions of paragraph 18, each party shall have the right and may apply to a court of competent jurisdiction for equitable relief from any violation or threatened violation of the covenants of this Agreement in addition to any other rights or remedies available at law or in equity.").)  In that case, although venue and "exclusive jurisdiction" is again fixed as Tennessee at "the appropriate state or federal court located in Nashville," there is no competing choice-of-law provision.  (*Id.*)  Viewed in context, this provision acts as a modification to the controlling arbitration clause, allowing either party to proceed to court in Tennessee to seek emergency injunctive relief.

What the agreements do not allow for is the possibility of non-injunctive litigation brought outside of the context of arbitration, which is what has taken place in this case.  But, "[t]he fact that [Plaintiff] chose to ignore the forum selection clause" contained in both the arbitration clause and the injunctive relief carve-out, and to instead "bring[] suit in New York[,] does not otherwise alter the [C]ourt's choice-of-law analysis."  *Ackerley Media Group, Inc. v. Sharp Electronics Corp.*, 170 F. Supp. 2d 445, 451 (S.D.N.Y. 2001).[8]

---

[7]  The breadth of the clause overrides the usual choice-of-law considerations related to tort claims.  *See Starnes Family Office, LLC v. McCullar*, 765 F. Supp. 2d 1036, 1046 (W.D. Tenn. 2011) (quoting *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)) ("Tennessee has adopted the 'most significant relationship' rule for torts under the Restatement (Second) of Conflict of Laws, which provides that 'the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation.'").

[8]  Despite crafting the agreements in this fashion, Plaintiff ignored the arbitration clause when it commenced this action.  Similarly, Defendant chose not to invoke the clause in defense to the lawsuit either with regard to arbitration or venue.  Therefore, the Court will not *sua sponte* dismiss or transfer the action for the parties' respective failures to follow or to enforce the terms of their agreements.  *See Concession Consultants, Inc. v. Mirisch*, 355 F.2d 369, 371 (2d Cir. 1966) ("Since the right to attack venue is personal to the parties and waivable at will, a district judge should not, in the absence of extraordinary circumstances, impose his choice of forum upon the parties by deciding on his own motion that there was a lack of proper venue.").

It is apparent that the parties—particularly Plaintiff, a Tennessee corporation—intended for Tennessee law to govern the multiple agreements at issue in this litigation wherever a legal action was initiated. *Town of Smyrna, Tenn. v. Mun. Gas Auth. of Georgia*, 723 F.3d 640, 646-47 (6th Cir. 2013) ("Tennessee would interpret this provision to ascertain the intent of the parties, according to the natural meaning of the words, giving effect to every term, and construing any ambiguity against the drafter"); *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 576 n.15 (6th Cir. 2003) (quoting *Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968)) ("Another well-established rule of contract construction points toward the same conclusion: 'the language of the contract, where ambiguous, will be construed most strongly against the party who drew it.'").

Since Tennessee bears a close relationship and has a material connection to Safe Step, and to the parties' agreements, New York choice-of-law principles require this Court to enforce the choice-of-law provisions. *Cf. LaGuardia Assocs. v. Holiday Hosp. Franchising, Inc.*, 92 F. Supp. 2d 119, 127 (E.D.N.Y. 2000) (party that drafted agreements selecting law of Tennessee was located in that state when the parties entered into the contracts, thus the Court assumed Tennessee had a "reasonable relationship" to the parties at that time). And, contrary to Defendant's argument, those broadly framed provisions apply to all of its claims. Therefore, Tennessee law governs Defendant's causes of action.

## II.    Defendant's Claims

Defendant's counter-claims fall into three general categories: contract-related claims, fraud claims, and statutory franchise and unfair or deceptive practices claims. Because the franchise-based claims could impact the nature of the parties' contractual relationship, the Court will address those first. *See* Robert W. Emerson, *Franchise Encroachment*, 47 Am. Bus. L.J.

191, 209 (2010) ("If a franchisee's exclusive territorial rights are violated, it not only has

contractual remedies, but also, in some states, statutory rights against the offending franchisor.").

### a. Franchise-based Claims

Defendant argues that the regional agreements constitute franchise agreements between

Safe Step and CKH under both federal law and corollary state law provisions.

### i. Federal Franchise Regulations

Under the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §§ 41–58, and rules

promulgated thereunder, a franchise is defined as "any continuing commercial relationship or

arrangement, *whatever it may be called*, in which the terms of the offer or contract specify":

> (1) The franchisee will obtain the right to operate a business that is
> identified or associated with the franchisor's trademark, or to offer,
> sell, or distribute goods, services, or commodities that are identified
> or associated with the franchisor's trademark; (2) The franchisor
> will exert or has authority to exert a significant degree of control
> over the franchisee's method of operation, or provide significant
> assistance in the franchisee's method of operation; and (3) As a
> condition of obtaining or commencing operation of the franchise,
> the franchisee makes a required payment or commits to make a
> required payment to the franchisor or its affiliate.

16 C.F.R. § 436.1(h) ("FTC Rule"). Thus, it has long been recognized that what the parties call

their relationship is irrelevant to the question of whether it constitutes a franchise. *Cf. Shah*, 338

F.3d at 575 ("If the relationship between [the parties] qualifies as a 'franchise relationship' under

the terms of the [statute] . . . how the parties describe their relationship is irrelevant.") (citation

omitted). Rather, should a supplier seek "to structure a distribution relationship which falls

outside the FTC Rule," it can avoid one of these three talismans—*i.e.*, "prohibit the use of its

trademarks . . ., refrain from providing any marketing assistance or exerting any control over its

dealers, or choose not to collect a franchise fee . . . ." Kim A. Lambert & Charles G. Miller, *The

*Definition of A Franchise: A Survey of Existing State Legislative and Judicial Guidance*, 9 Franchise L. J. 3, 4 (1989).

Looking at the NY/NJ Agreement as an example, it: (1) allows Defendant to use Safe Step's "[t]rademarks, [m]arks, [s]logans and [n]ames" within the contracted territory (*id.* ¶¶ 7, 26); (2) allows Safe Step to set minimum sales requirements (*id.* ¶ 5), to assist CKH in a marketing plan (*id.* ¶ 8; *see also* Marketing Addendum), to direct CKH to make changes to its business model (*id.* ¶ 10), to terminate the agreement for failure to "complete training" on Safe Step's products or for failure to provide potentially monthly "sales reports, income statements and balance sheets" (*id.* ¶ 3(a)(i), (viii)), and prohibits CKH from marketing or selling "any products that are competitive" with Safe Step's tubs (*id.* ¶ 6); and (3) required Defendant to pay at minimum a $5,000 fee[9] to enter into the agreement (*id.* at 16). Therefore, the first prong of the FTC Rule is undoubtedly met at this stage: CKH "distribute[s] goods . . . that are identified or associated with [Safe Step's] trademark[s]." *See* FTC Rule. The second prong is also met, since the alleged involvement by Safe Step in CKH's business operations may amount to the "authority to exert a significant degree of control" or "provide significant assistance in [CHK's] method of operation." *Id.*; (*see also* AACC ¶¶ 94-97, 99).[10] And, the third prong is satisfied based on CKH's alleged payment of a non-nominal fee "[a]s a condition of obtaining or

---

[9] Plaintiff appears to have missed the sentence in the regional agreements explaining that the license fee was $5,000 without the "show tub and pop up," or $10,000 with those items. (*Compare* NY/NJ Agreement at 16, *with* Pl. Reply Mem. at 12 ("The NY [agreement's] exhibits clearly show that the $10,000 license fee paid by CKH went to the purchase of a display tub and pop-up display and, therefore, was not a franchise fee . . .").)

[10] Although the Court decided "Defendant ha[d] not made *a sufficient showing* that Plaintiff exhibited a significant degree of control over Defendant's business" when denying Defendant's motion for a restraining order, the threshold for surviving a motion to dismiss is substantially lower. *Safe Step Walk-In Tub Co. v. CKH Indus., Inc.*, No. 15 Civ. 7543 (NSR), 2015 WL 6504284, at *2 (S.D.N.Y. Oct. 26, 2015) (emphasis added); *see Duboff Elec., Inc. v. Goldin*, 689 F.2d 387, 389-90 (2d Cir. 1982) (affirming denial of motion for preliminary injunction but reversing dismissal of complaint because even though plaintiff had "failed to establish its entitlement to a preliminary injunction," the court found that "more accurate and complete information" was needed to decide if plaintiff had sufficiently stated a claim).

commencing [its Safe Step related] operation[s]." (AACC ¶ 83); FTC Rule.[11]  Safe Step has

embraced, rather than avoided, the telltale marks of a franchise.

For these reasons on the basis of Defendant's allegations and the plain terms of the

regional agreements, this Court has little difficulty finding that the parties' relationship may

plausibly constitute a franchisor-franchisee relationship under the FTC Rule.  Nevertheless,

finding an alleged franchise under the FTC Rule and accepting Defendant's allegations that Safe

Step did not provide CKH with the disclosures required under the FTCA, (*see, e.g.*, AACC

¶ 155), does not in and of itself provide Defendant with an actionable claim.  *G&R Moojestic*

*Treats, Inc. v. Maggiemoo's Int'l, LLC*, No. 03 Civ. 10027 (RWS), 2004 WL 1110423, at *9

(S.D.N.Y. May 19, 2004) (citing *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237

(2d Cir. 1974) ("there is no private right of action to enforce the Disclosure Requirements of

§ 436, or any other regulation promulgated under the [FTCA]"); *see also Olivieri v. McDonald's*

*Corp.*, 678 F. Supp. 996, 1000 n.2 (E.D.N.Y. 1988) ("Several courts have concluded that there is

no private right of action under the [FTC] Rule."); *Mon-Shore Mgmt., Inc. v. Family Media*, No.

83 Civ. 5550, 1985 WL 4845, at *1 (S.D.N.Y. Dec. 23, 1985) ("this Court declines to recognize

a private cause of action under the FTCA").  This is why Defendant turns to state franchise law

and "Little FTC" statutes, as discussed below.

---

[11]  Furthermore, CKH's allegations when accepted as true, as they must be at this stage of the litigation, also correct some earlier deficiencies that influenced this Court's previous decision: at oral argument on Defendant's motion for a restraining order, "Defendant concede[d] that it d[id] not have evidence of payment of a franchise fee;" however, it has now alleged payment of such fees and provided an example for one of the agreements.  *Safe Step*, 2015 WL 6504284, at *2; *see, e.g.*, *Spiegel v. Quality Bakers of Am. Co-op., Inc.*, No. 91 Civ. 5703 (KTD), 1992 WL 349799, at *2, 6 (S.D.N.Y. Nov. 10, 1992) (where the "Sunbeam license [was] granted to eligible members of [a] cooperative free of charge," the arrangement was not a franchise"); (*but see* AACC ¶ 83 & Ex. F).

### ii. Franchise Law of Connecticut, New Jersey, New York, and Rhode Island

Defendant asserts the regional agreements also constitute franchises under the Connecticut Franchise Act, Conn. Gen. Stat. Ann. §§ 42-133e – 42-133n (West 2016), the New Jersey Franchise Practices Act, N.J. Stat. Ann. §§ 56:10-1 – 56:10-15 (West 2016), the New York Franchise Act, N.Y. Gen. Bus. Law. §§ 680 – 695 (McKinney 2016), and the Rhode Island Franchise Investment Act, R.I. Gen. Laws Ann. §§ 19-28.1-1 – 19-28.1-34 (West 2016). Defendant further asserts these statutes afford CKH additional protections that Plaintiff allegedly violated by terminating the franchise, constructively or otherwise, without good cause.  (AACC ¶¶ 165, 166, 187, 229 (Counts 6 (NY & NJ), 9 (CT), 15 (RI))); *see, e.g.*, *Red Roof Franchising, LLC v. Patel*, 877 F. Supp. 2d 124, 137 (D.N.J. 2012), *aff'd*, 564 F. App'x 685 (3d Cir. 2014) (New Jersey "enacted [its law] to remedy the disparity in bargaining power between franchisors and franchisees by protecting franchisees against indiscriminate terminations and nonrenewals").

### 1. Applicable Law

Because the Court has determined that Tennessee law governs this action, all of Defendant's claims under the other states' franchise laws would be non-cognizable unless it is clear that the public policy of Tennessee is to honor those outside states' statutory schemes. Speaking directly to this issue, Tennessee also has a statutory scheme designed to protect franchisees.  *See* Tenn. Code Ann. §§ 47-25-1501 – 47-25-1511 (West 2016); *id.* § 47-25-1505 (failure to renew a franchise requires franchisor to provide franchisee 60 days written notice containing the grounds constituting "good cause" for the decision not to renew), § 47-25-1503 ("good cause" and 30 day cure period required prior to termination).  And, like the other relevant states, Tennessee does not allow a choice-of-law clause to trump its statutory protections.  Tenn. Code Ann. § 47-25-1507 ("A franchisee may not waive any of the rights granted in any

provision of this part, and the provisions of any agreement which would have such an effect shall be null and void."); § 47-25-1510 ("No franchisee may prospectively assent to a release, assignment, novation, waiver or estoppel which would relieve any person from any liability or obligation under this part . . ."); *see also Terex Corp. v. Cubex Ltd.*, No. 06 Civ. 1639 (AJF), 2006 WL 3542706, at *8 (N.D. Tex. Dec. 7, 2006) ("if the agreement between [the parties] constitutes a franchise, then the application of the Texas choice of law provision would be contrary to a fundamental policy of Connecticut"); Conn. Gen. Stat. Ann. § 42-133f(f); *Red Roof Franchising*, 877 F. Supp. 2d at 130 ("Since the franchisee is located in New Jersey, it benefits from the protections of the [state scheme] regardless of the Texas choice of law provision"); N.Y. Gen. Bus. Law § 687 (in New York, "[a]ny condition . . . purporting to bind any person acquiring any franchise to waive compliance with any provision of [the New York franchise law]. . . shall be void" and "[i]t is unlawful to require a franchisee to assent to a . . . waiver . . . which would relieve a person from any duty or liability imposed by" the law); R.I. Gen. Laws Ann. § 19-28.1-14 ("A provision . . . requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under" Rhode Island's franchise law).

Therefore, the Court finds that Tennessee would honor the protections available under the franchise acts of states where Defendant allegedly has franchises. *Cf. Kinnard v. Shoney's, Inc.*, 100 F. Supp. 2d 781, 789 (M.D. Tenn. 2000), *aff'd*, 39 F. App'x 313 (6th Cir. 2002) ("whereas Tennessee law generally applie[d] to the issues in th[e] case, the plaintiffs' claims under the Indiana franchise statutes [were] governed by Indiana law" in respect of the Indiana's legislative policy against waiver of its franchise protections); *see also Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 133-34 (7th Cir. 1990) (Indiana franchise law applied notwithstanding New York choice of law provision in distributorship agreement).

## 2.   CKH's Safe Step Operations Qualify as State Law "Franchises"

The definition of a franchise under each state's statutory scheme is comparable to the FTC definition with minor differences and clarifications: mainly, whereas the FTC Rule requires "a significant degree of control over the franchisee's method of operation, or [] significant assistance in the franchisee's method of operation" by the franchisor, 16 C.F.R. § 436.1(h), the state laws are more specific and require some combination of "a marketing plan or system prescribed in substantial part by a franchisor," a "substantial[] associat[ion] with the franchisor's [marks]," or "a community of interest [between the parties] in the marketing of goods or services."  *See* N.Y. Gen. Bus. Law § 681(3)(a), (b); N.J. Stat. Ann. § 56:10-3; Conn. Gen. Stat. Ann. § 42-133e; R.I. Gen. Laws Ann. § 19-28.1-3.[12]  Each applicable state also requires a connection between the franchise and the state, such as the franchise being located within the state.  *See* Conn. Gen. Stat. Ann. § 42-133h; N.J. Stat. Ann. § 56:10-4(a)(1); N.Y. Gen. Bus. Law § 681(12); R.I. Gen. Laws Ann. § 19-28.1-4(d).

Therefore, Defendant plausibly alleges a substantial association with Plaintiff's marks, a marketing plan prescribed in substantial part by Plaintiff, a community of interest between the two in the marketing of the products (*see* AACC ¶¶ 96, 98),[13] and that CKH established business

---

[12]  "[I]n New York, a franchise will be found where there is a franchise fee *plus* a marketing plan *or* a license—i.e., only two elements are required, as long as one is the franchise fee.  By contrast, . . . Connecticut, . . . [and] New Jersey . . . have relationship laws that do not include a franchise fee requirement[.]"  Thomas J. Goodwin, *The Inadvertent Franchise*, Aspatore, 2013 WL 3773410, at *3 (June 2013).  Rhode Island requires all three: a marketing plan, a franchise fee, and association with a trademark.  R.I. Gen. Laws Ann. § 19-28.1-3.  New Jersey's approach is somewhat unique, following the "community of interest" test, which requires: "1) 'disparity in bargaining power'; 2) 'the presence of a franchise-specific investment by the licensee'; 3) 'the licensee's economic dependence on the licensor'; and 4) 'licensor's control over the licensee.'"  Salvatore A. Giampiccolo, Nicole DiBello, Jennifer M. Lahm, *Your Distributor May Be A Franchisee: If It Walks, Talks, and Sounds Like A Franchisee, It Is A Franchisee*, N.J. Law. at 14, 15 (February 2016); *see generally Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124, 140-46 (N.J. 1992) (discussing this requirement at length).

[13]  Focusing specifically on the unique requirement under New Jersey franchise law of a "community of interest," Defendant in this action alleges that marketing and advertising terms are dictated by the agreements between the parties, and that Plaintiff required an investment in employment knowledge and training regarding Safe Step's bathtubs.  Indeed, the agreements between the parties required CKH to "[v]igorously promote the sale and installation of the [tubs] in [the exclusive region]," to "[m]aintain procedures and records to assure systematic and

operations in each state (*id.* ¶¶ 164, 166, 187, 229).  On the basis of those allegations CKH's

Safe Step-related operations qualify as a franchises under each applicable state's law, entitling

Defendant to pursue these additional protections and causes of actions at this stage.

One caveat to the breadth of these claims, however, is that New York's franchise law has

a statute of limitations that "provides that an action 'shall not be maintained to enforce a liability

created under this section unless brought before the expiration of three years after the act or

transaction constituting the violation.'"  *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93,

102-03 (2d Cir. 2014) (quoting N.Y. Gen. Bus. Law § 691(4)).  Thus, any claims based on

failure to provide disclosures when the parties entered into the agreement would be barred in

New York.  *See id.* at 103 ("the 'act or transaction constituting the violation' occurred when the

franchises were purchased).  Claims based on the failure to renew or the constructive termination

of the agreements accrued between 2014 and 2015, and would not be barred since Defendant

filed its counter-claims in October 2015.[14]

### iii.   "Little FTC" Acts of New York and Rhode Island

Defendant claims that because the agreements are franchise agreements under federal and

state law, and because Plaintiff violated provisions of those laws, Safe Step has *per se* violated

---

complete sales, and marketing coverage of the [t]erritory," and to "[k]eep [Safe Step] advised as to the general
market conditions affecting the sales and installation of the [tubs]."  (*See, e.g.*, NY/NJ Agreement ¶ 9(c-e)); *compare
Orologio of Short Hills Inc v. The Swatch Group (U.S.) Inc.*, 653 F. App'x 134, 140 (3d Cir. 2016) (Third Circuit
concluded that "without more" a distributor "marketing the items on the shelf is [in]sufficient to create a community
of interest" as required under NJ franchise law since "some amount of marketing and advertising investments are par
for the course for any store that sells products manufactured by a supplier," and there was no evidence that
"investments in employee knowledge . . . were mandatory"), *with Morgan v. Air Brook Limousine, Inc.*, 510 A.2d
1197, 1204 (N.J. Super. Ct. Law. Div. Essex Cty. 1986) (concluding both parties "had a continuing financial interest
in the marketing of [franchisor's] service" where franchisee's "capital and labor only served to enhance and enlarge
[franchisor's] []market" and franchisor's "system-wide marketing and promotional network, good will, training and
supervision also served to build an instant customer base for [franchisee]").

[14]  This corresponds with Defendant's clarification that this action concerns the "period of time
commencing on January 1, 2015" and the "relation that evolved from dealer to franchise."  (Def. Opp'n at 2, 4.)
Plaintiff has offered no convincing reason to dismiss or narrow the claims related to the other three statutory
schemes.  (*See* Pl. Mem. at 21-24 (citing inapposite cases).)

both New York and Rhode Island's "Little FTC" Acts.  (AACC ¶¶ 157, 222 (Counts 5 & 14));

*see* N.Y. Gen. Bus. Oblig. Law § 349; R.I. Gen. Laws § 6–13.1–2.  "Deceptive conduct that does

not rise to the level of actionable fraud may also form the basis of a claim under [N.Y. GBL

§ 349], which protects *consumers* from conduct that might not be fraudulent as a matter of law,

and relaxes the heightened standards required for a fraud claim."  *M & T Mortg. Corp. v. White*,

736 F. Supp. 2d 538, 570-71 (E.D.N.Y. 2010) (emphasis added and citations omitted).  "The

conduct need not be repetitive or recurring but defendant's acts or practices must have a broad

impact on consumers at large; 'private contract disputes unique to the parties would not fall

within the ambit of the statute.'"  *Id.* at 571 (quoting *New York Univ. v. Continental Ins. Co.*, 87

N.Y.2d 308, 320 (1995) (internal citation omitted)); *see also Goldemberg v. Johnson & Johnson

Consumer Companies, Inc.*, 317 F.R.D. 374, 388-89 (S.D.N.Y. 2016).  Rhode Island's statute

also requires conduct that "causes substantial injury to consumers (or competitors or other

businessmen)."  *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 586 (M.D.

Pa. 2009) (citations omitted).

Given that the conduct complained of in Defendant's "Little FTC" counter-claims is the

violation of the FTCA and state franchise law disclosure obligations, which it urges constitute a

*per se* violation of these statutes, (*see* AACC ¶¶ 157, 222), these claims arise out of the parties'

contractual relationship and are not directed towards consumers.  *See Designers N. Carpet, Inc.

v. Mohawk Indus., Inc.*, 153 F. Supp. 2d 193, 198-99 (E.D.N.Y. 2001) (based on plaintiff's

allegations, dispute between dealer and manufacturer was not "consumer-oriented," but rather "a

private contract dispute that [was] unique to the parties and d[id] not fall within the ambit of

section 349"); *see also Sotheby's, Inc. v. Minor*, No. 08 Civ. 7694 (BSJ) (HBP), 2009 WL

3444887, at *6 (S.D.N.Y. Oct. 26, 2009) ("Absent facts from which harm to the public interest

can be inferred, conclusory allegations of harm to the public interest do not state a claim under Section 349.").  Therefore, these claims are outside the ambit of the statutes and must be dismissed.[15]  Whatever protections are available under the New York and Rhode Island franchise statutory schemes for the alleged wrongful termination or failure to renew the agreements will have to suffice.  *See* N.Y. Gen. Bus. Law § 687 (fraudulent and unlawful practices); R.I. Gen. Laws § 19-28.1-17 (fraudulent, deceptive and prohibited practices).

**b.  Contract-related Claims**

Turning to the contract claims, Defendant alleges that "Plaintiff [Safe Step] has steadfastly failed and/or refused to perform the [agreements] both during their original terms and extension terms."  (AACC ¶ 108.)  Specifically, CKH asserts that Safe Step:

- "has refused to permit Defendant the contractually permitted choice between choosing to achieve either minimum sales or advertising in lieu of participation in a national marketing campaign;"

- "has not held Defendant harmless for any liabilities of Plaintiff relative to sales, distribution, and/or advertising;"

- "has refused the explicit obligation to send valuable leads to Defendant in the normal course without charge;"

- "has not prominently stated in national advertising campaigns that the products are sold only outside the Defendant's exclusive territories, has not refrained from invading Defendant's exclusive territories, has not refrained from taking leads from Defendant;"

- "has not referred all inquiries to Defendant in Defendant's exclusive territories, [and] has intentionally encroached upon said exclusive territories and stolen sales from Defendant;" and

---

[15]  This determination also comports with the disclosure based causes of action being barred by the statute of limitations, at least with regard to the franchise law in New York, as discussed above.  *Cf. Bristol Vill., Inc. v. Louisiana-Pac. Corp.*, 170 F. Supp. 3d 488, 499 (W.D.N.Y. 2016) ("a plain reading of [p]laintiff's GBL § 349 cause of action reveal[ed] that [p]laintiff [was] seeking relief for the initial sale [of the product]" which was time-barred and any claim based on alleged "deception during the warranty claims process . . . would fail because any harm experienced by [p]laintiff during [that] process was individual and not an injury to the public at large").

- "has terminated the agreement, constructively or otherwise."

(AACC ¶ 102.)  These allegations form the basis of the majority of Defendant's counter-claims.

### i.  Breach of Contract Claims

"Under Tennessee common law, a plaintiff seeking damages for an alleged breach of contract must prove: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of contract."  *AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 726 F. Supp. 2d 307, 318 (S.D.N.Y. 2010) (citations omitted).  Defendant has certainly alleged that damages resulted from the breaches.  (AACC ¶¶ 102, 114, 117.)  Thus, the relevant inquiry at the motion to dismiss stage is whether Defendant has sufficiently alleged that the contracts are enforceable and that Plaintiff breached them.

### 1.  Existence of the Regional Agreements

Defendant alleges the existence of six contracts or regional agreements: the NY/NJ Agreement, the Albany Agreement, the Hartford Agreement, the Mass./NH/VT Agreement which was superseded by the Boston Agreement, (*see* Def. Opp'n at 5 n.5), and the Hampshire Bristol Agreement.  Copies of all but the Hampshire Bristol Agreement are attached to Defendant's answer with counter-claims.  Reviewing those agreements, the Mass./NH/VT Agreement is not signed by CKH and the Boston Agreement is not signed by Safe Step.  Defendant admits in its counter-claims that the Boston Agreement was never signed and that Hampshire Bristol Agreement was oral in nature.  (AACC ¶¶ 81-82.)  Each agreement, oral or written, was also allegedly modified by the Marketing Addendum in early 2014.  At that time, Defendant agreed to a fee schedule for Safe Step's national and regional marketing program and for customer leads generated through such advertising, as well as agreeing to the following:

> Fees described in [the Marketing Addendum] are subject to change
> based upon changes in market conditions.  Should a change in fee
> be necessary, Licensee may reject the change in fee and terminate

> participation in the [Addendum].   However, Licensor shall then
> have the right to re-direct the unique inquiries to the corporate office
> or another licensee.

Marketing Addendum at 4.

By the terms of the agreements, they expired between May 10, 2014 and February 10, 2015 unless Defendant requested renewal in writing 90 days prior to the end of the term.  (*See* NY/NJ Agreement at ¶2; Boston Agreement at ¶ 2; *see also* AACC ¶¶ 82 (oral Bristol/Hartford Agreement commencing at same time as Boston Agreement), 84, 86.)  "Defendant conceded at oral argument [on its restraining order motion] that it did not provide written notice within the specified timeframe" as required to extend the agreements.  *Safe Step*, 2015 WL 6504284, at *1.

Plaintiff makes much of the expiration of the regional agreements, but expiration would only change whether Defendant has actionable ongoing claims, or whether CKH's claims are limited to breaches occurring prior to the expiration of the agreements at issue.  *See, e.g.*, *Diversified Media Brokerage Partners v. Upscale Commc'ns, Inc.*, No. 07 Civ. 4285 (ENV) (VVP), 2010 WL 5068936, at *1 (E.D.N.Y. Dec. 6, 2010) (because the court "conclude[d] as a matter of law that the contract between the parties expired on October 1, 2004," and "the alleged breach occurred after that date, [plaintiff's] contract claim fail[ed] to state a claim for which relief [could] be granted."); *Package Exp. Ctr., Inc. v. Maund*, No. E2010-02187-COA-R3CV, 2011 WL 3241891, at *3 (Tenn. Ct. App. July 29, 2011) ("After the [agreement] expired, the parties' obligations under the contract were concluded, and there could be no further breach of the contract terms.").  Moreover, Defendant now argues the agreements continued "by reason of Safe Step's waiver of its right to written notice and/or Safe[] Step's acknowledgement that the [a]greements persisted after the expiration of their initial [t]erms, by reason of applicable

Franchise Law, and/or by reason of course of dealing and practice of the [p]arties."  (Def. Opp'n at 10; AACC ¶¶ 103, 107.)[16]

Because the agreements require all modifications be in writing, (*see, e.g.*, NY/NJ Agreement ¶ 23), Plaintiff "suggests that any oral modification would fail under Tennessee's Statute of Frauds."  *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 573 (6th Cir. 2003) (citing Tenn. Code. Ann. § 29–2–101) (parties must "memorialize certain types of contracts in writing"); (*see* Pl. Mem. at 17 (citing New York law)).  The Sixth Circuit, however, addressed this issue in *Shah*, explaining that under Tennessee law the "Statute of Frauds does not apply, however, once part performance occurs."  *Shah*, 338 F.3d at 573 (citing *Blasingame v. Am. Materials, Inc.*, 654 S.W.2d 659, 663 (Tenn. 1983), and other cases).  In *Shah*, the plaintiffs "altered their position to their detriment by installing a surveillance system, improving the coolers, increasing inventory, and modifying the store's layout," which they "might not have done [] if they believed [the] [d]efendant could terminate their lease and contract for reasons other than poor performance."  *Id.*  Therefore, the alleged oral modification of the franchise agreement was sufficient to support the plaintiffs' claims.

In fact, "[t]he most commonly recognized exception to [Tennessee's] Statute of Frauds is the doctrine of part performance."  *Garland v. Ford Motor Co.*, No. 12 Civ. 0121 (KHS), 2013 WL 3937017, at *3 (M.D. Tenn. July 30, 2013).  This "purely [] equitable doctrine [] is a judicial interpretation of the acts of the parties" employed "to prevent frauds."  *Shah*, 338 F.3d at 573. To invoke the doctrine:

> The plaintiff must be able to show such acts and conduct of the defendant as the court would hold to amount to a representation that he proposed to stand by his agreement and not avail himself of the

---

[16]  Previously, CHK "argued that the[] terms [of the agreements] [] created an automatic renewal of the [a]greement[s] absent termination," which this Court found to be "wholly inconsistent with a plain reading" of the terms.  *Safe Step*, 2015 WL 6504284, at *1.

> statute to escape its performance; and also that the plaintiff, in
> reliance on this representation, has proceeded, either in performance
> or pursuance of his contract, so far to alter his position as to incur an
> unjust and unconsc[ionable] injury and loss, in case the defendant is
> permitted after all to rely upon the statutory defense.

*Id.* This is true even if the contract expressly specifies that the parties may only modify the

agreement in writing. *Co–operative Stores Co. v. United States Fid. & Guar. Co.*, 195 S.W. 177,

180 (Tenn. 1917).

Here, as in *Shah*, CKH sufficiently alleges both the existence of oral contracts and oral

modifications of the written notice requirement in the renewal provisions of the written contracts,

along with part performance. These allegations plausibly support Defendant's claim that the

agreements, whether entirely oral or expired under their original terms, existed, continue to exist,

and are enforceable.

## 2. Alleged Breaches of the Regional Agreements

Having determined the regional agreements existed and are continuing based on

Defendant's allegations, the Court must now determine whether the conduct Defendant alleges

against Plaintiff would constitute breaches of those agreements. Under Tennessee law, the rights

and obligations of contracting parties are governed by the terms of their written agreements.

*Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). When a court

construes a contract it looks "to the language of the instrument and to the intention of the parties,

and imposes a construction which is fair and reasonable." *Wallace v. Nat'l Bank of Commerce*,

938 S.W.2d 684, 686 (Tenn. 1996) (quoting *TSC Industries, Inc. v. Tomlin*, 743 S.W.2d 169, 173

(Tenn. Ct. App. 1987)). Where the agreement is unambiguous, the meaning is a question of law,

and the court must enforce the agreement according to its plain terms. *Richland Country Club,*

*Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. Ct. App. 1991). At this stage, accepting

the allegations as true and drawing all reasonable inferences in favor of Defendant, CKH is alleging three potential timeframes for the above breaches.

The first set of breaches that arguably occurred during the "original terms" of the agreements—prior to any potential expiration and *before they were modified* by the Marketing Addendum—would be cognizable under the terms of those agreements (between mid-2009 through the end of 2013).[17]  Each of the items Defendant alleges as a breach (Safe Step's refusal to allow CKH to pick between minimum sales or advertising, to hold CKH harmless for Safe Step's advertising liabilities, to send valuable leads to CKH without charge, to refrain from invading CKH's exclusive territories, and unjust termination) would violate provisions of the original regional agreements.  (*See, e.g.*, NY/NJ Agreement at ¶¶ 5, 8(g), 8(i), 3(a).)  Thus, this category of breaches is actionable based on the inferences drawn from Defendant's allegations.

The second set of breaches, occurring after Defendant agreed with Safe Step to modify the regional agreements through the Marketing Addendum, which was effective January 2014, largely fail as a matter of law.  As noted above, it is true that the underlying agreements originally required Safe Step to "[s]end all relevant sales leads in [CKH's] [t]erritory" that Safe Step garnered "through customer inquiry, *advertising*, website, trade shows, *or any other type of media lead generation*" to CKH.  (*See, e.g.*, NY/NJ Agreement ¶ 8(b).)  Nevertheless, the modifications to that agreement, agreed to by the parties in the Marketing Addendum, introduced a monthly billing scheme for "unique leads" generated by Safe Step's national and regional marketing campaigns.  (Marketing Addendum at 1, 3.)  Therefore, the alleged breaches— excluding the allegations of failure to renew and constructive termination—premised on Safe

---

[17]  Although Defendant clarifies in its opposition papers that the "instant dispute covers that period of time commencing on January 1, 2015," the Court will not nullify the allegations in the counter-claims based on this clarification.  (*Compare* AACC ¶ 108, *with* Def. Opp'n at 2.)

Step failing to provide the original minimum sales choices rather than forcing CKH to participate in the marketing campaign, failing to hold CKH harmless for advertising costs, and failing to send the "valuable leads" free of charge and to avoid encroaching on CKH's exclusive territory are not breaches of the agreement as modified by the Marketing Addendum.  (*See also id.* at 3 (Safe Step "will make reasonable accommodations to [CKH] should [CKH] desire to not participate in regional and/or national advertising programs when and where practicable to do so. Such remedies may include allowing corporate office or other licensees to receive and follow-up on those national inquires received when [CKH] has indicated it does not wish to participate in regional or national programs.").)

Finally, Defendant has alleged a course of conduct and part performance extending the agreements into an extension term.[18]  Therefore, the last set of breaches occurring post-modification and extension (from mid-2014 onward) are actionable to the extent, as discussed, they are not in direct conflict with the Marketing Addendum.  Relatedly, Defendant is incorrect as a matter of contract interpretation that the Marketing Addendum by its terms expired in 2015. As Defendant alternatively argued, (*see* Def. Opp'n at 21), the addendum is co-terminus with the regional agreements it modified and would have extended along with those agreements, absent a specific repudiation.  (Marketing Addendum at 4 ("Licensee may reject the change in fee and terminate participation in the [Addendum].  However, Licensor shall then have the right to re-direct the unique inquiries to the corporate office or another licensee.").)[19]

---

[18]  This Court's previous decision in *Agar Truck Sales, Inc. v. Daimler Trucks N. Am., LLC*, No. 13 Civ. 5471 (NSR), 2014 WL 1318383, at *7 (S.D.N.Y. Apr. 1, 2014), is irrelevant to this question since it did not involve Tennessee's part performance doctrine.  *Id.* ("under the unambiguous terms of both renewal contracts, no contract between the parties existed after [the agreements expired]" based on the application of Michigan law).

[19]  If CKH is arguing that it affirmatively terminated its participation in the Addendum, then it is doubly clear that the alleged breaches based on failure to provide customer leads "without charge" would not be actionable under the modified terms of the agreements.

In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust. *Frank Rudy Heirs Associates v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997) (citation omitted). Courts are not "at liberty to relieve parties from their contractual obligations simply because these obligations later prove to be burdensome or unwise." *Hillsboro Plaza Enterprises*, 860 S.W.2d at 47 (citations omitted). This Court cannot relieve CKH of the burdens of the Marketing Addendum and the resulting changes to the agreements now that CKH regrets those changes, unless the state franchise laws operate to provide a remedy for burdensome alterations made at the behest of Safe Step—which is a question for a later juncture.

### ii.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Tennessee "courts have consistently imposed the implied covenant of good faith and fair dealing upon *every* contract." *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013). Nevertheless, "[b]reach of the implied covenant of good faith and fair dealing is not an independent basis for relief." *Shah*, 338 F.3d at 572. Therefore, these claims must be dismissed as duplicative of the breach of contract claims, the analysis of which will inject a "reasonableness" requirement into the language of the agreements.

Moreover, the implied duty cannot be breached by a party performing as "specifically allowed" in the contract. *Bank of Crockett v. Cullipher*, 752 S.W.2d 84, 91-92 (Tenn. Ct. App. 1988). Thus, to the extent Defendant is complaining of Plaintiff's actions taken pursuant to the Marketing Addendum, the terms of which were agreed to by the parties, such implied covenant claims must also be dismissed as a matter of law. (*See* AACC ¶¶ 135, 137, 149, 151, 180, 182, 200, 202, 214, 216, 242, 244.)

### iii.  Quasi-Contract Claims

Contracts implied in law or "quasi-contracts" are created by law without the parties' assent and are based upon reason and justice.  *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 524-25 (Tenn. 2005) (citations omitted).  "Courts may impose a contract implied in law where no contract exists under various quasi-contractual theories, including unjust enrichment."  *Id.* at 524 (citing *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)).  Here, the Court has found the existence of the contracts between Defendant and Plaintiff to be adequately pleaded.  Nevertheless, assuming Defendant presents sufficient allegations to support imposing the contracts on the parties in the interest of justice, CKH can proceed under these quasi-contract theories in the alternative at this time until the ultimate viability of the contract claims is determined on a complete factual record.  *Garland*, 2013 WL 3937017, at *5 ("The promissory estoppel and unjust enrichment claims in this case are dependent upon the existence of that alleged contract, and the damages flow from the alleged breach of that contract.").

The elements of an unjust enrichment claim are: 1) "[a] benefit conferred upon the defend[ing] [party] by the [complainant]," 2) "appreciation by the defend[ing] [party] of such benefit," and 3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof."  *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966).  "The most significant requirement of an unjust enrichment claim is that the benefit to the defending party be unjust."  *Freeman Indus.*, 172 S.W.3d at 525 ("a plaintiff may recover for unjust enrichment against a defendant who receives any benefit from the plaintiff if the defendant's retention of the benefit would be unjust").  Defendant has alleged that Plaintiff received the benefit of the regional agreements due to

Defendant's continued participation in the terms of those agreements, and—based on the facts alleged—the Court finds it would be unjust to allow Plaintiff to now claim the contracts do not exist. (*See* AACC ¶¶ 101, 103.)

Defendant also claims that promissory estoppel necessitates imposing a contract between Defendant and Plaintiff. "A promisor who induces substantial change of position by the promisee in reliance on the promise is estopped to deny its enforceability as lacking consideration." *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982). "The reason for the doctrine is to avoid an unjust result, and its reason defines its limits." *Id.* To establish a claim of promissory estoppel: "(1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted reasonabl[y] [regarding] [or] in justifiable reliance on the promise as made." *Id.*; *see also AllGood Entm't*, 726 F. Supp. 2d at 318 ("a party must show '(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that they reasonably relied upon the promise to their detriment'") (citation omitted).

Where sufficiently alleged, "the difficulty of succeeding on a promissory estoppel claim is not sufficient reason for dismissal on a motion to dismiss." *AllGood Entm't*, 726 F. Supp. 2d at 321 (even a "thinly pled claim" with "factual allegations about a specific promise between the parties that [the complaining party] opine[s] they relied upon and were damaged as a result" will survive). Defendant's allegations are sufficient to set forth such a claim and, therefore, to survive Plaintiff's motion to dismiss. Defendant alleges substantial detriment suffered upon reasonable (or justifiable) reliance on the continuing existence of the contracts between the parties. (*See, e.g.*, AACC ¶¶ 114, 121-23.) Plaintiff, as the alleged franchisor, would have been

aware that Defendant would suffer such a substantial loss if the alleged franchise was cancelled after Defendant's investment in the continuation of the franchise.  (*See, e.g.*, *id.* ¶¶ 98, 124.)

### c.  Fraud Claims

In addition to its statutory and contract claims, Defendant also proceeds on theories of liability grounded in common law tort.  Tennessee is accepting of such an approach during the initial stages of a litigation, allowing complainants "to pursue several alternative theories of recovery and to structure their claims in the manner that is most beneficial to them."  *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 909 (Tenn. 1999).  Defendant's counter-claims allege: common law business fraud and unfair competition, fraud, and fraud premised on deprivation of a viable business opportunity, respectively.  (AACC ¶¶ 247-59 (Count 18), ¶¶ 260-65 (Count 19), ¶¶ 266-77 (Count 20).)  In discerning which of these torts are cognizable under Tennessee law, the Court concludes Defendant is attempting to allege unfair competition and fraud.[20]

### i.  Unfair Competition

"Although Tennessee law regarding unfair competition is not well developed, it appears that the tort generally arises in the context of trademark infringement[.]"  *Whitehardt, Inc. v. McKernan*, No. 15 Civ. 1307 (AAT), 2016 WL 4091626, at *4 (M.D. Tenn. Aug. 2, 2016).  "[I]n that context, [the tort] requires three elements:"

> (1) the defendant engaged in conduct which 'passed off' its organization or services as that of the plaintiff; (2) in engaging in such conduct, the defendant acted with an intent to deceive the public as to the source of services offered or authority of its organization; and (3) the public was actually confused or deceived as to the source of the services offered or authority of its organization.

---

[20]  The Court notes that Defendant assumed New York law would apply to its tort claims and did not attempt to address the alternative possibility that Tennessee law would apply on the basis of the broad language included in the parties' agreements.  (*See* Def. Opp'n at 20-21.)

*Id.* (citing *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1243 (6th Cir. 1997)).  Defendant's allegations are of a different tenor, focusing on Plaintiff's "scheme and conspiracy to misappropriate, divert and convert Defendant's customers and trade secrets regarding potential customers, leads and business opportunities for its own pecuniary gain[.]" (AACC ¶ 248.)  Such allegations do not fit within the standard "unfair competition" mold.

However, Tennessee courts have also recognized that "the tort of unfair competition is simply a remedy for economic loss that is incurred from an underlying violation of a tort or a breach of contract." *Dade Int'l, Inc. v. Iverson*, 9 F. Supp. 2d 858, 862 (M.D. Tenn. 1998).  In that sense, "[u]nfair competition is a generic name for several related torts involving improper interference with business prospects." *Id.* at 862 (citing *B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 681 (Tenn. Ct. App. 1995) (citing Prosser and Keeton on the Law of Torts § 130 at 1013 (5th ed. 1984))).  Thus, claims of unfair competition have been found properly asserted when the complaining party sufficiently alleged either the accepted trademark infringement variety of underlying tort, or the tort of intentional interference with business relationships. *Trau–Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

But in this case, Defendant's allegations do not fit into either category.  Elaborating on the obvious difference between Defendant's claims of misappropriation and diversion of Defendant's customers and trade secrets and the traditionally cognizable claim where a party is "passing off" its products as that of another—here, CKH is using *Safe Step's* trademarks. Whatever disputes exist between Defendant and Plaintiff arise out of Plaintiff's alleged breach of its obligations under the parties' agreements.  (*See* AACC ¶ 251.)  They do not involve Plaintiff confusing the public as to whether the services offered are its own or Defendant's.  Rather, they

involve, for example, Safe Step acting on *its own behalf* to offer *its own* goods, despite

contracting with Defendant for exclusive marketing territory.

For the same reasons, the claim also fails under an intentional interference theory.  It is a

"basic principle under Tennessee law that a party to a contract cannot be liable for tortious

interference with that contract.  *Cambio Health Sols., LLC v. Reardon*, 213 S.W.3d 785, 789

(Tenn. 2006) (citing *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 760 (Tenn. 1977)).  "This

principle correctly reflects the purpose of the tort of intentional interference, which is to deter

*third parties* from interfering with the contractual relations of parties to a contract."  *Id.*

(emphasis added) ("The tort exists in addition to the right of a party to recover for breach of

contract.").  Because the allegedly tortious act was caused by Plaintiff, the other party to the

regional agreements, Defendant cannot base a tort of unfair competition on any intentional

interference premised on Plaintiff's actions.

Therefore, Defendant has failed to state a cognizable claim for unfair competition based

on the recognized theories under Tennessee law.  *See, e.g*, *Wyndham Vacation Resorts, Inc. v.

Wesley Fin. Grp., LLC*, No. 12 Civ. 0559 (WJH), 2013 WL 785938, at *10 (M.D. Tenn. Feb. 28,

2013) (counter-claiming "[d]efendants merely allege[d] that [the plaintiff] engaged in tortious

acts that deprived [d]efendants of its current and prospective customers," which did not

"sufficiently state a claim for unfair competition under Tennessee law"); *PHG Techs., LLC v. St.

John Companies, Inc.*, 459 F. Supp. 2d 640, 645 (M.D. Tenn. 2006) ("Assuming that the specific

tort of intentional interference with business relationships . . . falls within the general category of

'unfair competition,' [defendant's] attempt to state such a claim fails."); *Dade Int'l*, 9 F. Supp.

2d at 862 (citing *Nelson v. Martin*, 958 S.W.2d 643, 645-46 (Tenn. 1997) (Tennessee "does not

recognize the tort of interference with prospective economic advantage," therefore plaintiff was

unable to allege "a violation of any tort independent of the tort of unfair competition"); *cf. Vincit Enterprises, Inc. v. Zimmerman*, No. 06 Civ. 0057 (HSM), 2006 WL 1319515, at *5 (E.D. Tenn. May 12, 2006) (where court found "sufficient[] alleg[ations] [of] the tort of intentional interference with business relationships," it allowed an unfair competition claim).

### ii. Fraud

"In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "To satisfy the pleading requirements of Rule 9(b), a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *AllGood Entm't*, 726 F. Supp. 2d at 322 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Defendant broadly alleges that Plaintiff's entire course of dealings was designed to perpetrate a fraud against Defendant by intentionally escalating CKH's costs in order to constructively terminate the alleged franchises and unlawfully compete directly against CKH. (AACC ¶¶ 114, 116, 118, 248, 269.) More specifically, Defendant alleges that Plaintiff failed to provide disclosure documents required under applicable franchise law (*id.* ¶¶ 267-68, 273), appeared to accept CKH's request for a renewal of the agreements without actually intending to honor that request (*id.* ¶¶ 103, 270), and failed to make buy-out offers for Defendant's alleged franchise (*id.* ¶¶ 271-72). Plaintiff asserts these allegations are conclusory and lack the specificity required under Rule 9(b). (Pl. Mem. at 30-34.)

In Tennessee, "'intentional misrepresentation,' 'fraudulent misrepresentation,' and 'fraud' are different names for the same cause of action." *Hodge v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012). A claim for intentional misrepresentation requires that:

> 1) the defendant made a representation of an existing or past fact;
> 2) the representation was false when made; 3) the representation
> was in regard to a material fact; 4) the false representation was made
> either knowingly or without belief in its truth or recklessly;
> 5) plaintiff reasonably relied on the misrepresented material fact;
> and 6) plaintiff suffered damage as a result of the misrepresentation.

*Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008); *Brown v.*

*Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001) (quoting *Dobbs v. Guenther*, 846

S.W.2d 270, 274 (Tenn. Ct. App. 1992)) ("[n]ondisclosure will give rise to a claim for fraud

when the defendant has a duty to disclose" and the matters not disclosed are material).

Where a "[p]laintiff is making a separate claim of fraud in addition to claiming [a]

[d]efendant breached their agreements," the claim of fraud "arises from conduct during the

negotiations and separate from the agreement." *Id.* Defendant has alleged that Plaintiff, as part

of a scheme to deprive Defendant of the benefit of the parties' franchisor-franchisee relationship,

failed to disclose pertinent information about the franchise despite Safe Step's contractual, and

thus franchise law related, obligation to do so. Safe Step is on notice as to which actions and

which timeframes are implicated. Thus, Defendant's fraud allegations with regard to these

negotiations and pre-agreement activities are sufficiently pleaded at this stage. *See Dobbs v.*

*Guenther*, 846 S.W.2d 270, 274 (Tenn. Ct. App. 1992) (sufficient fraud allegations where

plaintiff alleged defendants led him "'to believe that all was well' even though they had already

decided to fire him in order to induce him" to take various detrimental actions and defendants

"attempted to undervalue [plaintiff's] interest in the corporations and partnerships by

fraudulently using a false set of business records to compute the dealerships' net worth").

But if the fraud claim is "'rooted in the performance of [an] agreement's terms,' [then] a

plaintiff will be held to contractual remedies." *Arch Wood Prot., Inc. v. Flamedxx, LLC*, 932 F.

Supp. 2d 858, 865 (E.D. Tenn. 2013) (quoting *Fifth Third Leasing Co. v. Cherokee Pontiac,*

*Buick, Olds, GMC Trucks, LLC*, No. E2001–01628–COA–R3–CV, 2002 WL 407224, at *2

(Tenn. Ct. App. Mar. 13, 2002)).  In this fashion, Defendant has also alleged fraud based on Safe

Step's purported acceptance of CKH's renewal under the agreements even though it had no

intent to follow through with that renewal.  Defendant's allegations casting the failure to renew

as fraud are essentially a claim for tortious breach of contract and cannot proceed.  *Arch Wood*

*Prot.*, 932 F. Supp. 2d at 865 ("tortious breach of contract . . . is not a cognizable cause of action

in Tennessee").

## III.  Injunctive Relief

The Court declines to decide at this time whether Defendant's request for an injunction

against Plaintiff "engaging in acts of illegal and unfair competition" (AACC ¶¶ 292-93)—

essentially enjoining Plaintiff from further alleged breaches of the parties' agreements—is

unnecessary given Defendant's claims for damages.  The appropriateness of injunctive relief will

be better decided upon a more complete factual record.

## IV.  Leave to Amend

It is within the Court's discretion to *sua sponte* grant leave to amend.  *See Grain Traders,*

*Inc. v. Citibank, N.A.*, 160 F.3d 97, 106 (2d Cir. 1998); *Witkowich v. Gonzales*, 541 F. Supp. 2d

572, 590 (S.D.N.Y. 2008).  In light of the Court's dismissal of Defendant's counter-claims under

the "Little FTC" Acts and considerable narrowing of the issues presented, the Court hereby

exercises that discretion and *sua sponte* grants Defendant leave to file a second amended answer

with counter-claims that conforms with this Opinion.  The Court cautions Defendant not to

reassert claims that have been dismissed herein unless, for example, they are reformulated under

the applicable franchise statutes.  *See supra* p. 19.

34

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to dismiss Defendant's counter-claims is

GRANTED in part and DENIED in part:

- The claims for breach of the implied covenant of good faith and fair dealing (Counts 2, 4, 8, 11, 13, and 17) are dismissed;

- The claims brought under N.Y. GBL § 349 and R.I. Gen. Laws § 6–13.1–2 (Counts 5 and 14) are dismissed; and

- The claim for unfair competition (Count 18) is dismissed.

The remaining claims are narrowed as discussed herein. The Clerk of the Court is respectfully

directed to terminate the motion at ECF No. 49.

Defendant shall file any amended answer in conformance with the above on or before

April 3, 2017. Plaintiff shall answer or seek a pre-motion conference on any potential non-

frivolous and non-repetitive motion to dismiss by May 3, 2017. The parties are directed to

contact Magistrate Judge Lisa M. Smith to schedule a status conference and shall also submit to

Judge Smith an amended case management plan.


Dated:     March 16, 2017                              SO ORDERED:
           White Plains, New York


                                                       _____
                                                       NELSON S. ROMÁN
                                                       United States District Judge